**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**NETJETS AVIATION, INC., et al.,**

    **Plaintiffs,**

   v.                                                       **Civil Action 2:20-cv-4464
Magistrate Judge Jolson**

**U.S. DEPARTMENT OF AGRICULTURE,**
et al.,

    **Defendants.**

## OPINION AND ORDER

This matter, in which the parties have consented to the jurisdiction of the Magistrate Judge, is before the Court on: Defendant U.S. Department of Treasury's ("DOT") Motion to Dismiss for Lack of Jurisdiction (Doc. 37) and Plaintiffs' Unopposed Motion for Leave to File Second Amended Complaint (Doc. 74-1). For the reasons that follow, DOT's Motion to Dismiss (Doc. 37) is **DENIED**, and Plaintiff's Motion to Amend (Doc. 74-1) is **GRANTED**. The Clerk is **DIRECTED** to docket Doc. 74-2 as the Second Amended Complaint.

**I.    BACKGROUND**

Plaintiff NetJets Aviation, Inc. ("NJA"), a company incorporated in Delaware and headquartered in Columbus, Ohio, "provides private aviation flight and aircraft management services for a wide variety of aircraft." (Doc. 28 at 1). Similarly, Plaintiff Executive Jet Management, Inc. ("EJM"), a company incorporated in Ohio and headquartered in Cincinnati, Ohio, "provides whole aircraft management services for private aircraft owners, which includes leasing those aircraft for charter flights . . ." (*Id*. at 2). Both companies are subsidiaries of NetJets Inc., a company also headquartered in Columbus, Ohio. (*Id*., ¶ 2).

As aircraft companies, NJA and EJM are subject to the Food, Agriculture, Conservation, and Trade Act (the "Act"). (*Id.*, ¶ 10). The Act authorizes the U.S. Department of Agriculture ("USDA") to establish and collect fees to cover the cost of agricultural quarantine and inspection services related to the arrival of commercial aircraft. (*Id.* (citing 21 U.S.C. § 136a(a))). Relevant here, the fees include Agricultural Quarantine and Inspection ("AQI") Fees, Immigration User Fees ("IUF"), and Customs User Fees ("CUF") imposed by the U.S. Customs and Border Protection ("CBP") under 19 U.S.C. § 58(c). (*Id.*, ¶¶ 10–22).

In 2020, CBP audited Plaintiffs. (*Id.*, ¶¶ 35–55). The auditor found that Plaintiffs misclassified several flights as non-commercial and never paid the requisite fees. (*Id.*, ¶¶ 37–39). USDA then billed Plaintiffs for the unpaid fees and for interest and statutory penalties. (*Id.*, ¶ 44). EJM owed roughly $100,000.00. (*See* Doc. 43 at 314; Doc. 64-1 at ¶ 7).

EJM challenged the USDA's imposition of fees, asserting that at least some of the flights at issue were fee exempt. (Doc. 28 at ¶ 53). Still, the USDA refused EJM's request to reduce the amount due and "forwarded its asserted claim against EJM to [DOT] for collection." (*Id.*, ¶ 55). DOT then billed EJM for the full amount in the audit report plus an additional charge for DOT's "costs for collection." (*Id.*). This additional charge is a "cross-servicing fee," which DOT's Fiscal Service's Debt Management Service ("DMS") charges to debt-referring agencies. (Doc. 71 at 4). For ease of discussion, the Court refers to the "cross-servicing fee" as simply "the Fee." DOT calculates the Fee each fiscal year "to determine the percentage of collections necessary to recover these [debts]." (*Id.*). The Fee is the basis of EJM's claim against DOT. (*See* Doc. 51 at 1 (recognizing that the Fee "is the central feature of EJM's claims against [DOT]")). Specifically, EJM says the Fee is "improper and irrational." (Doc. 72 at 1).

DOT, however, argues the Court cannot reach the merits of EJM's claim. In moving to dismiss, it makes two primary arguments: First, because it is protected by sovereign immunity, its actions in assessing the Fee are not subject to judicial review. Alternatively, DOT states it is simply following its statutory duty to assess a fee on a debt certified and referred to it by the USDA—making the USDA, not DOT—the proper party. (*See generally* Doc. 37). Unsurprisingly, Plaintiffs disagree. (*See generally* Doc. 51).

After the parties briefed DOT's Motion, the Court sought additional information. To that end, the parties agreed DOT would file declarations with supporting documents detailing its collection process and, thereafter, the parties would file supplemental briefs. (Doc. 63). The parties did so, and the matter is ripe for review. (*See* Docs. 70–72).

**II. STANDARD**

While DOT originally moved to dismiss on the pleadings, the parties have since submitted supplemental documents for the Court's consideration. Thus, DOT's Motion is best considered as one for summary judgment. Rule 12(d) of the Federal Rules of Civil Procedure permits the Court to convert the Motion in this way, but the parties must have "adequate notice" first. *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494, 504 (6th Cir. 2006). DOT, in its brief, contemplated the likelihood that the Court would convert their Motion (Doc. 71 at 7), and the parties discussed the same with the Court during their May 12, 2021, conference (Doc. 61). Each party took the opportunity to supplement the record and submit supplemental briefs. Accordingly, the Court treats DOT's Motion as one for summary judgment.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial "responsibility of informing the district court of the basis for

its motion, and identifying those portions" of the record that demonstrate "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (defining "genuine" as more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### III. DISCUSSION

DOT makes three arguments for dismissal: (1) This Court does not have jurisdiction to review the Fee or DOT's other collection practices because the United States has not waived sovereign immunity; (2) Absent any such waiver, EJM does not have a cognizable claim under the Declaratory Judgment Act ("DJA"); and (3) Even assuming jurisdiction exists, DOT is not the proper party here. (*See generally* Doc. 37). The Court evaluates each argument in turn.

First, however, the Court notes the nature of DOT's Motion as it relates to both NJA and EJM respectively. As Plaintiffs' Response brief illustrates, "[t]he [Fee] is the whole point of EJM's claims against [DOT] . . . " (Doc. 51 at 19). The Amended Complaint represents that the USDA "forwarded its asserted claim against EJM to [DOT] for collection." (Doc. 28 at ¶ 55). There is nothing further in the Amended Complaint illustrating that NJA's alleged debt was also

4

forwarded to DOT. (*See generally id*.). Accordingly, this Opinion and Order applies only to EJM's claims against DOT and not to any claims Plaintiffs may have against USDA or CBP.

### A. Jurisdiction

As a threshold matter, the Court must decide whether it has jurisdiction to review DOT's collection practices. The jurisdictional question is two-fold. First, DOT, as an agency of the United States, enjoys sovereign immunity. Unless that immunity is explicitly waived, it is not subject to suit. Second, if sovereign immunity has been waived, the Court still must have subject matter jurisdiction over EJM's claims. *FDIC v. Meyer*, 510 U.S. 471, 483-84 (1994) (recognizing that sovereign immunity and jurisdiction are distinct questions, with immunity being "[t]he first inquiry"). For the reasons that follow, the Court finds sovereign immunity has been waived and subject matter jurisdiction exists.

*1. Sovereign Immunity*

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Sovereign immunity is jurisdictional, and a federal agency may be sued only to the extent it consents to be sued. *Id*. Any such waiver of sovereign immunity "must be clear, express and unambiguous." *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1325 (6th Cir. 1993). Plaintiffs bear the burden of showing that sovereign immunity has been waived; otherwise, the Court must dismiss their claims for lack of subject matter jurisdiction. *Reetz v. United States*, 224 F.3d 794, 795 (6th Cir. 2000).

Here, EJM argues that sovereign immunity has been waived under the Administrative Procedure Act ("APA") and specifically 5 U.S.C. § 702. (Doc. 51 at 17). That provision provides a broad waiver of sovereign immunity and "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v.*

5

*Massachusetts*, 505 U.S. 788, 796 (1992).  In pertinent part, § 702 says that "[a] person suffering legal wrong because of agency action . . . is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency . . . acted or failed to act . . . shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."  5 U.S.C. § 702.  Accordingly, for the APA's waiver of sovereign immunity to apply to EJM's claims against DOT, there must have been "agency action" and it must be seeking relief other than money damages.

This second requirement is easily met.  As established, the APA's waiver of sovereign immunity does not apply where a party's "prime objective is [] simply to obtain money from the federal government."  *Coal. for Gov't Procurement v. Fed. Prison Indus.*, 365 F.3d 435, 480 (6th Cir. 2004).  Here, EJM seeks injunctive and declaratory relief only, placing its claims against DOT squarely within § 702's purview.  (*See* Doc. 28 at 21 ("Prayer for Relief")).  While EJM is seeking to have the money it has already paid refunded (*see* Doc. 70-2 at 2), its claim is not one for money damages because it is "an equitable action for specific relief . . . [seeking an] order providing for the 'recovery of specific property or monies.'"  *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 688 (1949)).  DOT does not meaningfully contest this point.  Accordingly, the Court finds EJM's claims against DOT as "seeking relief other than money damages."  5 U.S.C. § 702.  The next requirement, whether there was "agency action," requires a greater analysis, as detailed below.

    a. *Agency Action*

For 5 U.S.C. § 702 to take effect, there must have been agency action.  Importantly, this "waiver of sovereign immunity extends to all non-monetary claims against federal agencies and their officers sued in their official capacity, regardless of whether plaintiff seeks review of 'agency

6

action' or 'final agency action.'" *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668 (6th Cir. 2013). The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). The question here is: Does DOT's calculation and issuance of the Fee constitute agency action? The Court finds that it does.

As the parties recognize, USDA statutorily referred Plaintiffs' debt to DOT for collection, under 31 U.S.C. § 3711. The statute describes the process:

> If a nontax debt or claim owed to the United States has been delinquent for a period of 180 days:
>
> (A) the head of the executive, judicial, or legislative agency that administers the program that gave rise to the debt or claim shall transfer the debt or claim to the Secretary of the Treasury; and
>
> (B) upon such transfer the Secretary of the Treasury *shall take appropriate action to collect or terminate collection actions on the debt or claim.*

31 U.S.C. § 3711(g)(6) (emphasis added). The statute then lists "[c]osts properly charged" for "fee charges pursuant to this subsection[.]" § 3711(g)(7). It includes:

> [T]he costs of computer hardware and software, word processing and telecommunications equipment, and other equipment, supplies, and furniture; personnel training and travel costs; other personnel and administrative costs; the costs of any contract for identification, billing, or collection services; and *reasonable costs* incurred by the Secretary of the Treasury, including services and utilities provided by the Secretary, and administration of the Account.

*Id*. (emphasis added). This statutory language clearly directs DOT, an executive agency, to take specific action to collect a debt which has been cross-referenced to it. Even more instructive is DOT's own explanation of the process it undertakes when calculating the Fee. In his declaration, DMS employee Artur Kolasa stated that, in determining this "cross-servicing fee," DMS must consider a number of factors. (Doc. 70-3 at 2). Specifically, DMS established its 2021 Fee using three basic steps:

7

> a. DMS calculated the amount of direct and indirect costs attributable to the Cross-Servicing Program in fiscal year ("FY") 2020. When an activity supported more than one debt collection program, DMS allocated the costs of that activity using a combination of cost drivers. *These cost drivers reflect proxies for time spent by employees on each debt collection program (such as management estimates, time call center agents spent on calls for one program versus another, etc.).* In addition, DMS allocated information technology costs based on specific systems used by each debt collection program.
>
> b. DMS estimated the Cross-Servicing Program collections expected in FY 2021 using historical data and trends.
>
> c. Using the calculations and estimates above, DMS determined the percentage of collections necessary to recover these costs.

(*Id.*) (emphasis added). When DOT calculated this fee, pursuant to the directives and guidelines discussed above, it was creating "an agency rule, order, license, [or] sanction." 5 U.S.C. § 551(13). And by attaching this fee to EJM's debt, subjecting it to this "agency rule," DOT took agency action. In short, there were legitimate "legal consequences" that stemmed from the calculation and issuance of the fee. *Bituminous Cas. Corp. v. Walden Res., LLC*, 672 F. Supp. 2d 835, 848 (E.D. Tenn. 2009) (recognizing that "legal consequences" are the "touchstone" for determining what constitutes "agency action" under the APA).

The rights and obligations of EJM changed after the Fee was imposed. Not only did EJM now owe more money—over 30% more than it did previously—a different agency was responsible for calculating and issuing that additional amount. This change, and the accompanying "legal consequences," ultimately lead the Court to conclude that DOT's calculation and issuance of the Fee does constitute "agency action," as defined by the APA.

### b. *Exceptions to the APA's Waiver of Sovereign Immunity*

Yet, the analysis is not done. When there has been agency action, a presumption of judicial review is triggered under § 702. *Sackett v. E.P.A.*, 566 U.S. 120, 130 (2012). This is so because the legislative history of the APA "manifests a congressional intention that it cover a broad

spectrum of administrative actions and [the Supreme Court] has echoed that theme by noting that the [APA]'s 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140–41 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)). An agency may rebut that presumption "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent." *Abbott Labs.*, 387 U.S. at 140–41; *see also Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1652–1653 (2015) ("[L]egal lapses and violations occur, and especially so when they have no consequence. That is why [the Supreme Court] has so long applied a strong presumption favoring judicial review of administrative action.").

There are two narrow limitations on the APA's waiver of sovereign immunity found in 5 U.S.C. § 701(a). The APA does not apply where "a statute precludes judicial review." 5 U.S.C. § 701(a)(1). Nor does it apply where the challenged action "is committed to agency discretion by law." *Id*. at § 701(a)(2). "Both exceptions . . . are to be narrowly construed, and courts should restrict access to judicial review 'only upon a showing of 'clear and convincing evidence' of a contrary legislative intent.'" *Joelson v. United States*, 86 F.3d 1413, 1417 (6th Cir. 1996) (quoting *Abbott Labs*, at 140–41 (1967)). As explained below, neither exception applies here.

### i. 701(a)(1) –Precludes Judicial Review

Under 5 U.S.C. § 701(a)(1), the APA's wavier of sovereign immunity does not apply where the relevant "statute preclude[s] judicial review." DOT claims that is what we have here. But complete preclusion of judicial review under 701(a)(1) is "rare." *Diebold v. United States*, 947 F.2d 787, 795 (6th Cir. 1991) (citing S.Doc. No. 248, 79th Cong., 2d Sess. 212 (1946)). A statute is "meant to preclude review" only where it does so "upon its face" or provides "clear and convincing evidence of an intent" to do so. *Id*. And where there is "substantial doubt about []

9

congressional intent, the general presumption favoring judicial review of administrative action is controlling." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984).

DOT argues Congress intended to preclude judicial review of its collection activities, including the calculation of the Fee. (Doc. 37 at 8). Specifically, it contends that because 31 U.S.C. § 3711 does not provide a private cause of action, there is no right to judicial review, and EJM cannot rely on the APA. (*Id*. (citing 5 U.S.C. § 701(a)(1)). DOT relies on the Supreme Court's decision in *Block v. Community Nutrition Institution*, which provides a framework for cases, like this one, where a statute is silent on the availability of judicial review. In *Block*, the Court set forth factors to determine whether Congress intended to preclude judicial review. 467 U.S. at 345–46. The Court explained, "[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id*. DOT offers several arguments as to why the structure and substance of 31 U.S.C. § 3711 illustrate congressional intent to preclude judicial review. The Court considers and rejects DOT's arguments.

DOT begins with 31 U.S.C. § 3711's silence on judicial review, which it states shows that Congress meant to preclude review of any kind. (Doc. 52 at 12). Yet, it is well-established that "a statute's silence does not indicate that Congress intended to make agency action unreviewable[.]" *Duncan v. Muzyn*, 833 F.3d 567, 577 (6th Cir. 2016); *see also Ohio v. U.S. Army Corps of Engineers*, 259 F. Supp. 3d 732, 746 (N.D. Ohio 2017); *Peoples Gas, Light & Coke Co. v. U.S. Postal Serv.*, 658 F.2d 1182, 1190 n.4 (7th Cir. 1981).

DOT next argues that the legislative history of 31 U.S.C. § 3711, demonstrates Congress's intent to preclude judicial review. However, in making this argument, DOT relies solely upon an

10

opinion from a South Carolina District Court, which noted that 31 U.S.C. § 3711's primary objective is to "maximize collection of delinquent debts owed to the Government by the use of all appropriate collection tools." *United States v. S.C. Dep't of Corrs.*, No. 3-04-22066, 2006 WL 8446797, at *1 (D.S.C. June 14, 2006). The Court does not disagree that Congress wants government debt collection to be efficient. But the Supreme Court has told us that while "efficiency of regulation" is important, judicial review can be, and often is, more important. *Sackett*, 566 U.S. at 130.

More to the point, a Congressional desire for efficiency is not the sort of "specific legislative history" that satisfies the *Block* test. Instead, there must be indicia that Congress did not want review. For example, in *High Country Citizens All. v. Clarke*, the Tenth Circuit, relying on *Block*, cited the Congressional record—including direct quotes from legislators about litigation—in determining that Congress intended to preclude judicial review of the validity of a mineral patent under the General Mining Law of 1872. 454 F.3d at 1183–1190. In contrast, DOT's lone cite to a case interpreting 31 U.S.C. § 3711's efficiency goals provides no meaningful insight into congressional intent.

Similarly, DOT emphasizes the nature of the agency action here. It asserts that Congress has mandated it to collect government debt—so how could Congress have intended that collection be subject to judicial review? (Doc. 52 at 12). For support, it cites cases where courts have declined to review DOT's collection of a debt. (*Id.*). But those cases analyze DOT's statutory mandate to offset a debt. (*See id*. at 12 (citing *Dasisa v. Dep't of Treasury*, 951 F. Supp. 2d 45 (D.D.C. 2013)). Under 26 U.S.C. § 6402(g), "[n]o action brought against the United States to recover the amount of any such [offset] shall be considered to be a suit for refund of tax." Given this statutory mandate, it makes sense that Congress intended to preclude judicial review of DOT's

11

offset practices. But the instant case does not involve any offset. Here, DOT did something categorically different. It tacked on a collection fee to the underlying debt that it calculated and imposed of its own volition. (*See* Doc. 70-3 at 2 (detailing how, and under what parameters, DOT calculates the Fee for its "Cross-Servicing Program")). So the offset cases do not provide an answer here.

Finally, DOT relies on 31 C.F.R. § 900.8, which sets forth standards for DOT and the Department of Justice ("DOJ") for collecting debts. The regulation provides: "[t]he standards in this chapter do not create any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States . . . " 31 C.F.R. § 900.8. Yet, generally speaking, a single statutory provision, like 31 C.F.R. § 900.8, rarely, if ever, serves as a full-stop to judicial review. *See Thomas v. Pompeo*, 438 F. Supp. 3d 35, 43–44 (D.D.C. 2020) (finding reviewability even where a regulation provided that a statute was "not intended to" and did "not create any right or benefit" to judicial review); *Tugaw Ranches, LLC v. U.S. Dep't of the Interior*, 362 F. Supp. 3d 879, 881, 889 (D. Idaho 2019) (finding reviewability despite the fact that statute at issue provided "no determination, finding, action or omission under this chapter shall be subject to judicial review"). Nor does it render the entire statutory scheme unreviewable. *See, e.g.*, *Motaghedi v. Pompeo*, 436 F. Supp. 3d 1345, 1355–56 (E.D. Cal. 2020) (rejecting the government's argument that because one regulation indicated "it does not create any right or benefit . . ." the entire statutory scheme precluded review); *City Of Albuquerque v. U.S. Dep't Of Interior*, 379 F.3d 901, 916 (10th Cir. 2004) (noting that where "one executive order specifically states it does not create a private right of action," that does not mean that "another executive order lacking a similar provision also does not create a private right of action").

And more specifically, at least one court has rejected the argument that 31 C.F.R. § 900.8 insulates DOT's actions from review. In *Confederated Tribes & Bands of The Yakama Nation v. United States*, the Court analyzed 31 C.F.R. § 900.8's language barring private action. 89 Fed. Cl. 589, 592–603 (2009). Despite the seemingly broad language, the Court was "convinced" judicial review of the government's debt collection on long-term Indian reservation leases was appropriate. *Id*. And judicial review allowed plaintiffs "to hold [the government] accountable for its record of decision-making" surrounding its collection practices. *Id*. EJM likewise seeks to hold DOT accountable here.

Additionally, it is worth noting that there is language in 31 C.F.R. § 900.8 that counters DOT's suggested interpretation. The latter half of the regulation provides that "the failure of an agency to comply with any of the provisions of parts 900-904 of this chapter be available to any debtor as a defense." 31 C.F.R. § 900.8. Several commenters have noted that, considering the regulation as a whole, it can be "interpreted to mean that failure to comply with the regulations is not a defense to the underlying debt, but can still be a basis for quashing the particular collection method." *See* 1A Consumer Credit Law Manual § 8.07 (2019); 1A Debtor-Creditor Law § 8.07 (2021); *see also Ramirez v. Dep't. of the Army*, 86 M.S.P.B. 211 (2000) (holding that creditor agency cannot deduct debt from retirement pay until it has complied with its own regulations by completing hearing requested by debtor). And that is what EJM seeks to do here. It does not fault DOT for the underlying debt that it also contests. Instead, it challenges the process DOT undertook in calculating and applying the Fee.

All told, the language of 31 C.F.R. § 900.8 is not "clear and convincing" evidence of congressional intent to preclude judicial review. Indeed, the Supreme Court has cautioned against coming to a contrary conclusion. "[I]f the express provision of judicial review in one section of a

13

long and complicated statute were alone enough to overcome the APA's presumption of reviewability for all final agency action, it would not be much of a presumption at all." *Sackett*, 566 U.S. at 129.

Instead, courts find that Congress intends to preclude review where a statute provides some form of review or relief. This makes sense when considering the presumption of reviewability. The presumption is in place to provide a check and balance on agency action. So, where there is already a forum in place, it can be assumed that Congress did not intend for courts to interfere with that process. *See, e.g., Beamon v. Brown*, 125 F.3d 965, 971 (6th Cir. 1997) (deferring to review process under the Veterans Judicial Review Act); *Clarke*, 454 F.3d at 1182 (deferring to The General Mining Law of 1872 review path).

But there is no judicial review process or alternative access to relief baked into the statute here. Debtors have no way to challenge the fees associated with the underlying debt. And while each debt issuing agency may have its own procedures to contest a debt, DOT has provided no similar statutory scheme in 31 U.S.C. § 3711 or its accompanying regulations to contest a "cross-servicing fee" as applied by DOT during its collection process. It is in situations like this—where there is no avenue for judicial review—that the APA provides protection. For example, in *Joelson v. United States*, the Sixth Circuit was tasked with determining whether Congress intended to preclude review of the termination of a U.S. Trustee appointed as part of the DOJ's Trustee Pilot Program. 86 F.3d 1413 (6th Cir. 1996). The Court summarily determined that "the statutory scheme governing the U.S. Trustees Program, contains no express indication that Congress sought to prohibit judicial review and there is most certainly no 'showing of clear and convincing evidence of a . . . legislative intent' to restrict access to judicial review[.]" *Id*. at 1417 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). So, the Court concluded, "701(a)(1) does not prevent judicial

review of [plaintiff's] claims under the [APA]." *Id.*; *see also Sackett v. E.P.A.*, 566 U.S. 120, 130, 131 (2012) (allowing judicial review where the APA provided the sole mechanism for potential relief); *Hyatt v. Office of Mgmt. and Budget*, 908 F.3d 1165, 1171 (9th Cir. 2018) (permitting judicial review where there was no other way for plaintiff to challenge the agency's action, even though the relevant statute contained a provision limiting any such review).

In sum, there is nothing in "the structure of the statutory scheme, its objectives, its legislative history, [or] the nature of the administrative action involved" showing congressional intent to preclude judicial review of DOT's calculation and issuance of the Fee. And the exception under § 701(a)(1) to judicial review does not apply.

### ii. 701(a)(2) – Committed to Agency Discretion

Turning to the remaining waiver exception, while neither party addresses the issue, the Court must determine whether DOT's action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception is also "very narrow." *Hi-Tech Furnace Sys. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000). It is "reserved for those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Id.* In those rarities, there is no "statutory reference point" by which to judge the agency's actions. *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 37 (D.D.C. 2020). And even where there are statutory standards, "a decision may still be 'committed to agency discretion by law,' and thus unreviewable, if those standards are not 'judicially manageable.'" *Trump*, 453 F. Supp. 3d at 38 (quoting *Legal Assist. for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997)).

Notably, "[t]he 701(a)(2) exception is generally limited to 'certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion.'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019) (quoting *Lincoln v. Vigil*,

15

508 U.S. 182, 191 (1993)). There are very few "categories of [such] administrative decisions." *Id.* And they generally concern an executive action "in which courts have long been hesitant to intrude." *Franklin v. Massachusetts*, 505 U.S. 788, 817 (1992). These few categories include: an agency's refusal to institute investigative or enforcement proceedings (*Heckler*, 470 U.S. 821 (1985)); the decision not to reconsider a final agency action on the grounds of material error (*ICC v. Locomotive Eng'rs*, 482 U.S. 270, 282 (1987)); the CIA Director's decision to terminate an employee in the interests of national security (*Webster v. Doe*, 486 U.S. 592 (1988)); and the allocation of funds from a lump-sum appropriation (*Lincoln*, 508 U.S. 182 (1993)).

DOT's process of calculating a collection fee on a federal debt does not fit into one of these narrow exceptions. Rather, "this case involves the sort of routine dispute that federal courts regularly review: An agency issues an order affecting the rights of a private party, and the private party objects that the agency did not properly justify its determination under a standard set forth in the statute." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018).

Importantly, the standards here are not "drawn in such broad terms that . . . there is no law to apply." *Hi-Tech Furnace Sys.*, 224 F.3d at 788. In looking for a workable standard, the Court considers the statutory scheme as a whole, in addition to "formal and informal policy statements and regulations[.]" *Kondapally v. U.S. Citizenship & Immigr. Servs.*, No. CV 20-00920 (BAH), 2020 WL 5061735 (D.D.C. Aug. 27, 2020); *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) ("It is well settled that an agency, even one that enjoys broad discretion, must adhere to voluntarily adopted, binding policies that limit its discretion."). As detailed above, the statutory scheme in this case provides the Court with ample standards against which to evaluate DOT's assessment and calculation of the Fee. Particularly useful is the language directing the secretary to take "appropriate action," and the requirement that costs assessed must be "reasonable," as well as the

16

factors DMS considers when calculating the Fee for each fiscal year. *See* 31 U.S.C. § 3711(g)(6)–(7); (Doc. 70-3 at 2). At base, this guidance and the accompanying regulations "include[] substantial, detailed legal and policy analysis, review of which is well within [the] [C]ourt's competency in applying the APA." *MediNatura, Inc. v. Food & Drug Admin.*, 496 F. Supp. 3d 416, 449 (D.D.C. 2020), *aff'd*, 998 F.3d 931 (D.C. Cir. 2021).

The exceptions contained in § 701(a) do not apply here. Accordingly, because EJM's claims stem from "agency action" and do not seek money damages, the APA's waiver of sovereign immunity applies.

2. *Federal Question Jurisdiction*

As detailed above, 5 U.S.C. § 702 waives DOT's sovereign immunity here. Given this "separate and independent statutory waiver of sovereign immunity," the Court has subject matter jurisdiction so long as EJM's claims "arise under federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 27–28 (1983). 28 U.S.C. § 1331 provides that "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." There is no dispute that EJM's claims against DOT fall within § 1331's purview. (*See generally* Doc. 28). And EJM's claims are properly before the Court.

3. *The Declaratory Judgment Act*

In their Amended Complaint, Plaintiffs also cite to 28 U.S.C. § 2201, the DJA, as a basis for the Court's jurisdiction. (Doc. 28 at ¶ 7). In determining whether the Court has jurisdiction over a DJA claim, "[t]he key issue . . . is whether the impending or threatened action would raise a federal question. In other words, the question is whether the federal courts would have subject matter jurisdiction over the threatened claim." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 463 F.3d 473, 476 –477 (6th Cir. 2006). As shown above, sovereign immunity has been

waived under § 702 and the Court has subject matter jurisdiction over EJM's claims against DOT. So, although "the Declaratory Judgment Act . . . is not an independent source of federal jurisdiction," EJM's claims for declaratory relief against DOT are properly before this Court.

### B. Proper Party

Finally, DOT argues that "[e]ven assuming this Court had jurisdiction over Plaintiffs' claims . . . [it] is not a proper party and must be dismissed[.]" (Doc. 37 at 9). More specifically, DOT attests it is not the proper party because it "has no independent role in determining whether offset or other debt collection methods are appropriate" and it "is simply collecting the amounts [owed] as directed by" the USDA. (*Id*. at 10). That may be so. But it is also doing more than that. As explained, it applies numerous factors to determine the Fee for each fiscal year. And it is DOT—not USDA, that is responsible for that process and ultimate determination. (*See* Doc. 64-2 at 2 ("DMS determined its FY 2021 debt collection fee for the Cross-Servicing Program in three basic steps[.]"); Doc. 64-1 ("The fees DMS charges for collections [are] generated through its Cross-Servicing Program[.]")). Accordingly, because DMS, an arm of DOT, independently calculated the Fee, DOT is not only a proper party, but a necessary one.

In sum, the APA permits the Court to review DOT's calculation and issuance of the Fee in this case. DOT's Motion to Dismiss (Doc. 37) is **DENIED** as a result.

### C. Amendment

Finally, the Court considers Plaintiffs' unopposed request to amend. (Doc. 74-1). Plaintiffs seek to amend their complaint a second time "to add a claim that Treasury's policy about what collection fees to charge—a fee of 30% (or 32%, depending on the category of debt) of the amount recovered—is a rule that is invalid under the APA." (*Id*. at 3). Defendants do not oppose the Motion.

Two federal rules govern Plaintiffs' Motion. Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that when a party seeks leave of court to file an amended pleading, "[t]he court should freely give leave when justice so requires." Thus, the trial court enjoys broad discretion in deciding motions for leave to amend. *See Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990). In exercising its discretion, the trial court may consider such factors as "undue delay, bad faith or dilatory motive on the part of a movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

However, since Plaintiffs moved to amend after the Court's deadline to amend, they "must meet the higher threshold for modifying a scheduling order found in Rule 16(b)." *Shane v. Bunzl Distrib. USA, Inc.*, 275 F. App'x 535, 536 (6th Cir. 2008). This means Plaintiffs must "show good cause under Rule 16(b) for the failure to seek leave to amend prior to the expiration of the deadline before [the Court] will consider whether the amendment is proper under Rule 15(a)." *Hill v. Banks*, 85 F. App'x 432, 433 (6th Cir. 2003). This Court has noted that "the touchstone of the good cause inquiry under Rule 16(b) is whether the moving party acted diligently in attempting to meet the deadline set forth in the pretrial order." *Permasteelisa CS Corp. v. Airolite Co., LLC*, No. 2:06-cv-0569, 2007 WL 1683668, at *2 (S.D. Ohio June 8, 2007).

Plaintiffs have demonstrated good cause under Rule 16(b). Because Defendants do not oppose the Motion, there is no contention that Plaintiffs did not act diligently in attempting to meet the deadline to amend or that the proposed amendments will otherwise prejudice Defendants. Accordingly, for good cause shown and in light of the federal policy in favor of liberal amendment, Plaintiffs' Unopposed Motion (Doc. 74-1) is **GRANTED**. The Clerk is **DIRECTED** to docket Doc. 74-2 as the Second Amended Complaint.

### IV. CONCLUSION

For the foregoing reasons, DOT's Motion to Dismiss (Doc. 37) is **DENIED**, and Plaintiff's Motion to Amend (Doc. 74-1) is **GRANTED**. The Clerk is **DIRECTED** to docket Doc. 74-2 as the Second Amended Complaint. The Court's stay on case deadlines is hereby **LIFTED,** and the parties are directed to progress pursuant to the amended case schedule set by the Court (Doc. 79).

IT IS SO ORDERED.


Date: August 13, 2021                                s/ Kimberly A. Jolson
                                                     KIMBERLY A. JOLSON
                                                     UNITED STATES MAGISTRATE JUDGE